UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EUGENE J. THOMAS, an individual, and
WALTER JAMIL, (a/k/a  WISAM
JAMIL and WALTER THOMAS),

           Plaintiffs,                Case No. 2013-cv-\_\_\_\_

v.

PARVIZ DANESHGARI, (A/K/A PERRY
DANESHGARI), an individual, HAROLD G.
BRESLIN, (a/k/a/ J.R. BRESLIN), an individual,
SAMIR SHABANDER (a/k/a SAM SHABANDER),
an individual, and Computer Business World, LLC,
a Michigan Limited Liability Company,

           Defendants.

_____/

**CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C.**
By:    **RONALD G. ACHO**  (P-23913)
        **JAMES R. ACHO** (P-62175)
33900 Schoolcraft
Livonia, MI  48150-1392
(734) 261-2400
Attorneys for **Plaintiffs**

_____/

**COMPLAINT AND DEMAND
FOR TRIAL BY JURY**

      There was a prior action with Judge Arthur J. Tarnow, U.S. District
Court case number 10-12214 involving many similar facts,
circumstances and parties arising from this cause of action.

    Plaintiffs, EUGENE THOMAS and WALTER JAMIL by and through their attorneys,

**CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C.** by **RONALD G. ACHO AND JAMES**

**R. ACHO**, state as follows:

## JURISDICTION AND VENUE

1.　　Plaintiff, Eugene J. Thomas (hereinafter "Gene"), is an individual who resides in the City of Farmington Hills, County of Oakland, State of Michigan.

2.　　Plaintiff, Walter Jamil, (a/k/a Wisam Jamil and Walter Thomas) (hereinafter "Walter"),is an individual who resides in the City of Rochester, County of Oakland, State of Michigan.

3.　　Defendant Parvis Daneshgari (a/k/a Perry Daneshgari) (hereinafter "Daneshgari"), is an individual who resides in the City of Flint, Genessee County, Michigan, but has operated businesses in Southeast Michigan.

4.　　Defendant, Harold G. Breslin (a/k/a J.R. Breslin) (hereinafter "Breslin"), is an individual who resides in the City of Grand Blanc, Genessee County, Michigan.

5.　　Defendant, Samir Shabander (a/k/a Sam Shabander) (hereinafter "Shabander"), is an individual who resides in the City of Warren, Macomb County, Michigan.

6.　　Defendant Computer Business World, LLC, (hereinafter "CBW, LLC") is a Michigan Limited Liability Company which was located throughout Southeast Michigan.  At all times relevant to this cause of action, Gene and Walter each have a 5% phantom member interest in CBW, LLC pursuant to their respective Amended and Restated Phantom Membership Agreements dated July 5, 2006 ("Membership Agreements").  Attached as Exhibits A and B are the respective Membership Agreements for Gene and Walter.

7.　　This Court has jurisdiction over this matter pursuant to Gene and Walter's respective Membership Agreements' jurisdiction provisions.  Further, this Court also has federal jurisdiction pursuant to 15 U.S.C. §1692k(b)(2)(d) (FDCPA), 18 U.S.C. §1964(c) (RICO), and 28 U.S.C. §1331.

2

This Court has pendent jurisdiction over the state law claims pursuant to Gene and Walter's respective Membership Agreements and 28 U.S.C. §1367. The amount of damages is in excess of $75,000.00.

## GENERAL ALLEGATIONS

8.      Plaintiffs restate and reallege the allegations contained in Paragraphs 1 through 8 as if fully set forth herein.

9.      At all times relevant to these allegations, Gene is, and has been, married to Joanna Thomas (hereinafter "Joanna"), and they are husband and wife. They were married in 1995 and they have three daughters.

10.     At all times relevant to these allegations, Walter is, and has been, married to Nibras Jamil (hereinafter "Nibras"), and they are husband and wife. Nibras and Walter were married in 1991, and they have five children.

11.     In 1990, Gene and Walter founded Computer Warehouse, a regional computer retailer based in Michigan, which was acquired by Inca Computer Company in 1997.

12.     In 1999, Gene and Walter co-founded Computer Builders Warehouse ("CBW"), a national computer retailer based in Macomb County, Michigan. Under their leadership, CBW grew from a local to a national presence, with stores in Michigan, Florida, Nevada, Alabama, Texas and Georgia.

13.     CBW was made up of several separate entities. These included CBW Enterprises, Inc., a retail company, and CBW Technologies, Inc., an assembly plant and a distribution facility for the retail company, and SCD Enterprises, LLC. Gene and Walter also owned Times Square Inc., which provided advertising, marketing and consulting services to CBW, and TBI Enterprises, which

3

was a franchise company, and American Eagle Warranty, which sold warranties to stores (hereinafter CBW and these related entities will be referred to as the "CBW businesses").

14.     Under the CBW concept, Gene and Walter offered "Build To Order" and "Ready To Go" hi-quality, low-price Desk Tops, Laptops and Server computers through their state of the art manufacturing/assembly facility, carried the largest specialty computer parts selection, and provided a service lab in each store.

15.     Over its 15 1/2 years of existence, the CBW businesses were very successful and built a strong base of both business and consumer customers, all served out of its retailer storefronts and the internet.  Outstanding service and quality products drove CBW's sales.

16.     The CBW stores targeted the built-to-order computer market, but they sold a few ready-built systems, typically at discounted prices.  The stores also offered their own financing.  Each store also had a service lab.

17.     CBW stores' competition included large national stores, such as Dell, CompUSA, Micro Center and Best Buy, as well as small independent computer stores.

18.     Because of supplier relationships, CBW store prices were comparable to their larger competition.  CBW maintained a significant cost advantage over the small independent computer stores.

19.     CBW's estimated sales mix was 30%-35% computer sales, 50%-55% parts and accessories, and 7%-10% lab services and networking.

20.     Because of their tremendous purchasing power, their two main suppliers offered them a rebate program that was not published.  It involved submitting advertising invoices that did not have to be placed so that rebates could be paid to the CBW businesses.  It was called the Marketing Development Fund (MDF).

21.     This program was with the blessing of the two main suppliers and with the full knowledge of Defendant's Shabander and Breslin.  This practice was well known to Defendant Shabander and Breslin for years, prior to CBW sale in 2006 to Defendant Daneshgari.

22.     Walter was the Chief Executive Officer of the CBW businesses and was in charge of product development, purchasing, merchandising, strategic planning and vendor contracts.

23.     Gene was the Chief Operations Officer for the CBW businesses, and he developed the company from a local store to a nationwide presence and developed the franchise plan for CBW. He was also responsible for all aspects of sales, marketing, operations, franchising development and training.

24.     Gene and Walter also owned CBW Texas, which was a partnership corporation in Texas.  In addition to all of the companies that Gene and Walter owned, they also had ownership interests in a number of franchises.

25.     The CBW businesses had created a niche for themselves, any even though competitors like Dell and Hewlett Packard were in big box stores, stores like Best Buy and Office Depot would often send customers to a CBW store because they always carried inventory for customers that was hard to find.

26.     The CBW businesses were profitable and successful.

**The Attack in 2002.**

27.     In January 2002, Gene's and Walter's oldest brother, Sabah, died suddenly of a massive heart attack, just ten months after the death of their own father, leaving a widow and three children.

28.     Out of the kindness of their hearts, and without any legal obligation, Gene and Walter agreed to provide for the widow and their brother's children, for a period of time.

29.     Because his late brother and his family had recently purchased a house in the Novi area which had a very large mortgage, Gene and Walter kindly agreed to make the monthly payments on the house until the widow could sell it.

30.     Graciously, Gene and Walter offered to give their sister-in-law $7,000.00 per month for the mortgage payments and other expenses, strictly out of compassion. They even offered to give the widow their own mother's home once the Novi house sold.   But the house, surprisingly, did not sell over a several month period despite its desirability.   This was at a time when the residential housing market was very strong.

31.     Gene and Walter conditioned these payments on the house being sold because it was extravagant and was no longer affordable by the widow. But, it was clear, that the home had to be sold because of the loss of income to the widow as a result of her husband's passing.

32.     Disappointingly, it came to Gene's attention that the widow was delaying the sale of the house.  Gene approached the widow about her obstructing the sale of the home.  He informed her at that time that there would be no more payments to her unless she cooperated in selling the house.  The payment of $7,000.00 per month was a significant expenditure and had to be stopped. The widow became upset and there was a dispute.

6

33.     The next day, June 6, 2002, Gene and Walter were at the headquarters of the CBW businesses in Warren, Michigan when one of the widow's brothers menacingly confronted Gene because of his and Walter's refusal to continue paying the $7,000.00 per month to his widowed sister.

34.     A half an hour later, five of the widow's brothers came enraged to the Warren location and threatened the employees.  Gene was attacked with pepper spray.

35.     Walter was also attacked and was stabbed four times in the back after he had been pepper sprayed.

36.     Walter was in critical condition because he was bleeding profusely.  He was rushed by the paramedics to the hospital where he hovered near death.


**The Transfer of TBI in 2003.**

37.     The assailants, the widow's brothers, did not go on trial for the attacks on Walter and Gene for two years.  Even after their convictions, they were not sentenced for almost another year after that.  During the three year period, Gene and Walter, and their wives, Joanna and Nibras, received numerous calls from people in their community pressing that the charges be dropped.  Some of the calls were very threatening and caused great fear among all four people.

38.     Significantly, even a respected member of the community, also intervened, requesting compassion and mercy for the assailants.

39.     But, there were also threats, as relatives and friends of the assailants' family tried to "persuade" Gene and Walter to drop the charges.  Their efforts at persuasion were, in fact, threats on Gene and Walter's lives.

40.    Four of the brothers went on trial and were convicted. Three of them were sentenced to approximately a year and a half in jail, and then 90 days in boot camp, and the older brother who instigated the violent assault was sentenced to two or two and a half years in prison. The fifth brother, who stabbed Walter, entered into a plea bargain soon after the other brothers were convicted.

41.    During 2002 and 2003, Joanna and Nibras were understandably very concerned about the safety of Gene and Walter. Joanna was concerned that Gene might disappear, not come home one night and never be seen again. Nibras was frantic that the assailants might return to kill Walter or harm her children.

42.    Joanna and Nibras were also concerned that their children could be harmed. Nibras, asked the school's secretaries, principal and lunch moms to watch them carefully, and she would even park outside the school yard, watching her children during the lunch recess. Joanna as also justifiably worried about her daughter's safety.

43.    During this time, Joanna and Nibras were also very worried about their financial security should anything happen to either Gene or Walter. Neither Gene nor Walter had Wills or Trusts set up, and they had no life insurance .

44.    Joanna spoke to Gene, and Nibras spoke to Walter, about financial issues and their ability to support their young families if anything were to happen to either Gene or Walter.

45.    Gene and Walter also had several discussions about their various business interests and what would be the best way to provide their families with financial security. Eventually, Gene and Walter settled on transferring their interests in TBI to Joanna and Nibras  because it would be the easiest business for them to own and manage.

8

46.    Plaintiff TBI Properties, LLC is a single asset holding company for real property located at 32600 John R, Madison Heights, Michigan, which served as a CBW retail store location.

47.    Gene and Walter were the members of TBI from when it was started in 1996 until 2003 when their ownership interests were transferred to Joanna and Nibras.

48.    Gene and Walter then spoke to Defendant Shabander, the Chief Financial Officer of the CBW businesses, and directed him to find an attorney to prepare the necessary transfer documents to transfer their interests in TBI to their spouses, Joanna and Nibras.  Shabander hired an attorney, who was also a CPA, Robert Hindelang, to transfer Gene and Walter's membership interest in TBI to Joanna and Nibras.

49.    Defendant Shabander directed Hindelang to prepare documents that would transfer the membership interests in TBI from Gene and Walter to Joanna and Nibras and discussed the preparation of the TBI transfer documents in detail with Hindelang.

50.    Hindelang was advised that the intended goal in the transfer of the interest in TBI was to gift Gene and Walter's ownership interest to their spouses respectively.  Defendant Shabander sent Hindelang TBI records in order to assist in the preparation of the transfer documents, and Hindelang prepared the transfer documents.

51.    On October 9, 2003, Gene and Walter held a meeting of the members of TBI and transferred their membership interest in TBI to Joanna and Nibras.  The next day, October 10, 2003, Gene and Walter met with Joanna and Nibras at the CBW location, and the four of them signed the remaining TBI transfer documents in the presence of a notary, Renee Ayar.

9

52.     Going back to 2003, Defendants Shabander and Breslin knew, and were fully aware, that Gene and Walter's membership interests in TBI had been transferred to their spouses, Joanna and Nibras, in October 2003.

53.     Defendants, Shabander and Breslin, were well aware that the transfer had taken place in 2003, and that Gene and Walter had no membership interest in TBI after the transfer. This was five years before any arbitration involving CBW and Defendant Daneshgari took place.

54.     Defendants Shabander and Breslin had advised Defendant Daneshgari that TBI was owned by Joanna and Nibras, and not Gene and Walter, as early as 2007.

55.     Despite that knowledge that Gene and Walter had no interest in TBI, and that TBI was no longer owned by them, Defendant Daneshgari wrongfully pressured the Bankruptcy Trustee to try to get TBI from Joanna and Nibras seven years later. That became the subject of the litigation before Bankruptcy Judge Stephen Rhodes, and then later, the appeal before the Honorable Arthur Tarnow.

56.     When TBI was transferred to Joanna and Nibras, there was an outstanding loan to TBI. In November 2003, the Bank rewrote the loan, and Joanna and Nibras now, for the first time, became guarantors along with Gene and Walter.

**The Sale of the CBW Businesses in 2006.**

57.     Throughout their ownership of the CBW businesses, Gene and Walter were often approached by brokers to sell CBW, their very successful business, and their related businesses. In 2005, they were approached by a new broker, Blue River Financial Group, and asked if they would be willing to sell the CBW businesses.

58.     Gene and Walter said they would be willing to entertain offers if the Financial Group could find a buyer willing to pay $5 million.

59.     The Blue River Financial Group met with Defendant Shabander to gather the financial information for the CBW businesses and prepared a prospectus for potential buyers. The prospectus contained a general history of the CBW businesses, identified CBW's target markets, products and services, franchising, marketing and competition. It also contained an organization chart of the CBW businesses and biographies of Gene and Walter, as well as Defendants Shabander and Breslin.

60.     The Financial Group brought Defendant Daneshgari to Walter and Gene as a potential buyer who was interested in purchasing the CBW businesses.

61.     Gene and Walter went to the law firm that they had been using to handle the sale of the CBW businesses.

62.     That law firm which had been representing Gene and Walter for a number of years was retained to protect the interests of Gene and Walter. They were to represent their legal best interests and protect their rights regarding the handling of the sale of their businesses.

63.     Gene and Walter consulted with those attorneys regarding the sale of the CBW businesses, and directed them to negotiate with Defendant's Daneshgari's attorneys regarding the sale and to draft the necessary and appropriate documents to sell the CBW businesses, including, but not limited to, the Asset Purchase Agreement.

64.     During the course of said representation by that Firm, Gene and Walter advised their attorneys of certain practices known as a Market Development Fund (MDF) which allowed Gene and Walter to send advertising statements to their suppliers to receive advertising reimbursements, with full knowledge and support from the suppliers, even though, in part, the advertising statements

11

reflected charges which had not actually been incurred by Gene and Walter.

65.    During the course of the negotiation process with Defendant Daneshgari for the purchase of the CBW businesses, the practice was also disclosed to him verbally and in writing, and discussed with him on more than one occasion.

66.    Despite Gene and Walter's disclosure of the MDF program to their attorneys, they did not properly draft the Asset Purchase Agreement and other documents to protect Gene and Walter which should have also included the disclosure of the MDF program.

67.    Had the Asset Purchase Agreement and other documents been properly prepared, the dishonesty and the improper acts of Defendants Daneshgari, Shabander and Breslin would have been rendered moot.

68.    On June 26, 2006, Defendant Daneshgari's Computer Business World, LLC ("CBW, LLC") entered into an Asset Purchase Agreement as buyer of the CBW businesses, including American Eagle Warranty Corporation, Times Square, Inc., CBW Enterprises, Inc., CBW Technologies, Inc., and SCD Enterprises, as sellers.  The Asset Purchase Agreement is attached hereto as Exhibit C.

69.    Under the Asset Purchase Agreement, CBW, LLC agreed to purchase substantially all of the assets of the CBW entities for a purchase price of: $2,000,000.00 at closing, $700,000.00 pursuant to a Promissory Note after the closing, and the assumption of outstanding bank debt in the amount of $1,371,237.85.

70.    Under the Asset Purchase Agreement, the purchase prices was allocated as follows: $419,431.00 to working capital, $230,000.00 to equipment, $7,800.00 to security deposits, and $2,049,769.00 to good will.

71.     The closing occurred on July 5, 2006.

72.     As part of the sale of the CBW businesses, Gene and Walter each entered into an Amended and Restated Phantom Membership Interest Agreement dated July 6, 2006 (hereinafter "Membership Agreement').

73.     As part of their respective Membership Agreements, Gene and Walter each received phantom membership interests in CBW, LLC equivalent to 5% of the membership interests.

**Draining of the Assets of CBW, LLC in 2007.**

74.     Defendants Daneshgari, Shabander and Breslin all conspired to drain the assets of CBW, LLC. The inventory was liquidated and not replaced. Large quantities of computers were sold below costs. Top sales employees were terminated. Discretionary decision making ability was taken away from store managers.

75.     These acts were done by the Defendants for the improper purpose of draining the assets of CBW, LLC and denying Gene and Walter their rightful share of profits of CBW, LLC pursuant to their respective Membership Agreements.

76.     Defendant Daneshgari conspired with Defendants Shabander and Breslin to divert over $500,000.00 in inventory from CBW, LLC and divert the inventory to a computer store he opened in Grand Blanc, Michigan.

77.     This computer store in Grand Blanc, Michigan was owned by Defendant Daneshgari but hidden under his wife's name, where Defendant Breslin works.

78.   In furtherance of the conspiracy, Defendant Daneshgari conspired with Defendant Breslin to divert the $500,000.00 in computer inventory so that Defendant Breslin could manage the Grand Blanc computer store for Defendant Daneshgari. Upon information and belief, Defendant Breslin remains the store manager at the Grand Blanc store to the present.

79.   Defendant Daneshgari, as part of his intent to drain the assets of CBW, LLC and to deny Gene and Walter their rightful share of profits of CBW, LLC , paid his company, MCA, an exorbitant fee of $70,000.00 per month. This $70,000.00 per month was for alleged consulting services, which were unnecessary and a mere sham to drain money from CBW, LLC.

80.   Defendant Daneshgari billed CBW, LLC approximately $800,000.00 for such services, in furtherance of his intent to drain the assets of CBW, LLC and to deny to Gene and Walter their rightful share of profits of CBW, LLC under their respective Membership Agreements.

81.   Defendant Daneshgari sold almost $400,000.00 in computer hardware and related inventory to a big box store, below cost, and pocketed the money.

82.   In furtherance of his conspiracy to drain the assets of CBW, LLC and deny Gene and Walter their rightful share of profits under their respective Membership Agreements, Defendant Daneshgari then deposited the funds in a non-CBW bank account.

83.   In furtherance of his conspiracy to drain the assets of CBW, LLC and deny Gene and Walter their rightful share of profits under their respective Membership Agreements, Defendant Daneshgari increased CBW's line of credit for approximate $300,000.00 by fraudulently reporting consignment inventory as his inventory, and by borrowing against 180 day inventory, while simultaneously claiming the inventory was worthless.

84.     Defendant Daneshgari then demanded an off set from the promissory note owed to Gene and Walter.  Further, he reversed invoices (sold inventory) to a layaway (back in inventory) and fraudulently overstated the inventory to the bank in order to obtain the line of credit.

85.     As part of the conspiracy to drain the assets of CBW, LLC and deny Gene and Walter their rightful share of profits under their respective Membership Agreements, Defendant Daneshgari leased CBW corporate headquarters to one of his (sham) office buildings and charged an exorbitant $200,000.00 in rent in less than one year.

86.     As part of his conspiracy to drain the assets of CBW, LLC and deny Gene and Walter their rightful share of profits under their respective Membership Agreements, Defendant Daneshgari laid off or terminated CBW employees and withheld their paychecks.

87.     In furtherance of his conspiracy to drain the assets of CBW, LLC and deny Gene and Walter their rightful share of profits under the Membership Agreement, Defendant Daneshgari did not pay rent to the landlords.

88.     As part of his conspiracy to drain the assets of CBW, LLC and deny Gene and Walter their rightful share of profits under their respective Membership Agreements, Defendant Daneshgari did not pay vendors for inventory of approximately $1,000,000.00.

89.     Defendant Daneshgari did not pay off on the $700,000.00 promissory note owed to Gene and Walter and did not pay them for their membership interest in CBW, LLC.

90.     Defendant Daneshgari has engaged in other improper and deceptive acts with other creditors, which ruined the good will and reputation of CBW, LLC.

91.     Walter had an employment contract with CBW, LLC as part of the Asset Purchase Agreement. CBW, LLC and Defendant Daneshgari wrongfully terminated Walter in order to deprive him of income and to prevent him from observing the wrongful conduct of Defendants Daneshgari, Shabander and Breslin.

92.     Gene had a contract to provide contractor services to CBW, LLC as part of the Asset Purchase Agreement. CBW, LLC and Defendant Daneshgari wrongfully breached the agreement with Gene in order to deprive him of income and to prevent him from observing the wrongful conduct of Defendants Daneshgari, Shabander and Breslin.

93.     Defendant Daneshgari kept the books and records and never released information to Gene and Walter under the Asset Purchase Agreement in order to manipulate the books, and has engaged in other improper and deceptive acts against CBW, LLC as part of his conspiracy to drain the assets of CBW, LLC and deny Gene and Walter their rightful share of profits under their respective Membership Agreements.

**The Arbitration in 2008.**

94.     In approximately the fall of 2007, Defendant Daneshgari's CBW LLC filed a complaint with the American Arbitration Association alleging breach of contract and fraud in the inducement. Specifically, Defendant Daneshgari's CBW LLC alleged that Gene and Walter created dummy invoices for advertising and gave those invoices to Advanced Micro Devices ("AMD") in order to qualify for reimbursement of advertising dollars through an MDF program for purchasers of large quantities of AMD parts.

16

95.     On August 4, 2008, the Arbitrator issued its Opinion and Award in favor of Defendant Daneshgari's CBW LLC and awarded Defendant Danishgari's CBW LLC damages in the amount of $2,800,000.00, plus interest. The Opinion and Award of Arbitrator is attached as Exhibit D.

96.     The Arbitrator, based upon the perjured testimony of Defendants Daneshgari, Shabander, and Breslin, found in favor of Daneshgari.

97.     That perjured testimony by Defendants Daneshgari, Shabander, and Breslin caused the Arbitrator to believe that Gene and Walter had engaged in fraudulent activity.

98.     But for the legal malpractice by Gene and Walter's lawyers and the perjured testimony by Defendants Daneshgari, Shabander, and Breslin, there would have been no adverse Arbitration Award which has caused complete chaos in the lives of Gene and Walter.

99.     The Arbitrator found that Gene and Walter breached the provisions of the Asset Purchase Agreement by failing to continue to work for CBW, LLC for one year after the closing, based on the false and misleading testimony of the three Defendants, Daneshgari, Shabander, and Breslin.


**Lawsuit Against TBI in Oakland County Circuit Court in 2008.**

100.    Two days later, on August 6, 2008, Defendant Daneshgari's Limited Liability Company, Computer Business World, LLC ("CBW, LLC") filed an action in the Oakland County Circuit Court to confirm the arbitration award lawsuit which was assigned Case No. 08-093586-CK. On November 12, 2008, the Order was entered confirming the Arbitration award and entering Judgment. Attached as Exhibit E is the November 12, 2008 Order.

17

101.    On November 18, 2008 Defendant Daneshgari's CBW, LLC filed a second Complaint against Gene and Walter, as well as TBI Properties, LLC, and various John Doe/Jane Doe defendants, which was assigned Case No. 08-096130-CK, (hereinafter " second Oakland County lawsuit").  Attached as Exhibit F is a copy of the second Oakland County lawsuit.

102.    The second Oakland County lawsuit sought satisfaction of the Judgment that was entered pursuant to the Arbitration award in favor of CBW, LLC against Gene and Walter.

103.    Among other things, the second Oakland County lawsuit sought injunctive relief against the transfer of any assets by Gene and Walter, including TBI, and the attachment of Gene and Walter's interest in TBI, which Defendant Daneshgari knew was non-existent.

104.    In the second lawsuit, Defendant Daneshgari contended that TBI was owned, through member interest, by Gene and Walter, despite his knowledge of the evidence of the October 2003 transfer of the membership interests to Joanna and Nibras.

105.    During the second Oakland County lawsuit, Joanna and Nibras, the owners of TBI, provided Defendant Daneshgari with written proof that the transfer had taken place on October 10, 2003, including the TBI Properties, LLC Transfer Documents that were executed by Gene and Walter and Joanna and Nibras.

106.    Despite the evidence of the 2003 transfer of TBI, and the evidence Joanna and Nibras held membership interest in TBI since October 10, 2003, Defendant Daneshgari continued with his baseless claims against TBI and Joanna and Nibras.

107.    Attempts by Defendant Daneshgari to attach Joanna's and Nibras' member interests in TBI was improper, and known to be improper by Defendant Daneshgari.

18

108.    The second Oakland County lawsuit proceeded through the completion of discovery. On June 25, 2009, Joanna and Nibras, as owners, had TBI file their Motion for Summary Disposition. While the Motion was pending, and before any hearing was held on the Motion, Defendant Daneshgari abruptly filed a Motion to Dismiss the action Without Prejudice in order to file separate Adversary Proceedings against Joanna and Nibras in the Bankruptcy Court.

109.    This second Oakland County lawsuit was dismissed without prejudice over TBI's strenuous objections while Defendants' Motion for Summary Disposition was pending on October 7, 2009. The rationale of Defendant Daneshgari's withdrawal came to be known later.

**Identical Lawsuit Against TBI in Bankruptcy Court in 2009.**

110.    On December 17, 2008, Gene and Walter filed separate Voluntary Petitions for relief under Chapter 11 of the United States Bankruptcy Code. On September 14, 2009, the proceedings were converted to Chapter 7 proceedings for the purpose of investigating avoidable or preferential transfers and dispositions of assets belonging to Gene and Walter, and a Trustee was appointed.

111.    Defendant Daneshgari engaged in game playing and forum shopping. He knew his case against TBI in Oakland County Circuit Court was going to be dismissed with prejudice and wanted the matter transferred to the Federal Bankruptcy Judge who had already been openly hostile to Gene and Walter.

112.    As a result, on October 5, 2009, Defendant Daneshgari caused Adversary Proceedings to be filed against Joanna and Nibras in each of their husbands' bankruptcy proceedings for the purpose of voiding the transfer of TBI to Joanna and Nibras that had occurred seven years earlier. The Complaint filed against Nibras Jamil was assigned Case No. 09-06259-swr and is attached

19

hereto as Exhibit G.  The Complaint filed against Joanna Thomas was assigned Case No. 09-06260-swr and is attached hereto as Exhibit H.

113.    Defendant Daneshgari knew that the Federal Bankruptcy Judge   had made an unwarranted prejudgement of the merits of the case, and that the judge was biased and hostile toward Gene and Walter due to his actions and rulings during hearing throughout the Bankruptcy Proceedings and selected that Federal forum on that basis.

114.    Throughout the Bankruptcy trial, the Federal Bankruptcy Judge made premature rulings favorable to Defendant Daneshgari before he had heard all of the relevant evidence on the issue.

115.    After being faced with unrebutted testimony from attorney Robert Hindelang who prepared the transfer documents in 2003, and the bank officer who handled the loan to TBI in November 2003, as well as the bank's loan file which contained copies of the TBI transfer documents, the Federal Bankruptcy Judge had to conclude that the transfer of TBI occurred in 2003.

116.    On May 20, 2010, the Federal Bankruptcy Judge granted Joanna and Nibras' Motion for Judgment on Partial Findings, dismissed the Adversary Proceedings that had been filed against them on behalf of Defendant Daneshgari, and entered separate Judgments in their favor. The Judgment dated May 20, 2010 that was entered in Adversary Proceeding Case No. 09-06259-swr (in favor of Nibras Jamil) is attached hereto as Exhibit I.  The Judgment dated May 20, 2010 that was entered in Adversary Proceeding Case No. 09-06260-swr (in favor of Joanna Thomas) is attached hereto as Exhibit J.

## Two Appeals of Bankruptcy Court Decision in 2010.

117.    Defendant Daneshgari then had the Trustee appeal the Federal Bankruptcy Judge's decision to the United States District Court for the Eastern District of Michigan on June 4, 2010, where it was assigned to the Honorable Arthur Tarnow and consolidated into one appeal.

118.    Judge Tarnow affirmed the Judgment of the Bankruptcy Trial Court and dismissed the Appeal which had been filed by the Trustee on Defendant Daneshgari's behalf on November 15, 2010.  The Order Affirming Bankruptcy Court's Orders of February 4, 2010 and May 13, 2010, Affirming Judgements entered May 21, 2010 and Denying Cross-Appeals dated November 15, 2010 is attached hereto as Exhibit K.  The Judgment dated November 15, 2010 affirming the Bankruptcy Trial Court's Judgment in the Adversary Proceedings is attached hereto as Exhibit L.

119.    Defendant Daneshgari then had the Trustee file a Notice of Appeal with the Sixth Circuit Court of Appeals on December 14, 2010.  The appeal to the Sixth Circuit Court of Appeals was dismissed by stipulation of the parties on March 26, 2012.

## Seizure of Joanna and Nibras' Possessions in 2010.

120.    Upon a Motion filed on Defendant Daneshgari's behalf, the Oakland County Circuit Court entered a separate Request and Order to Seize Property as to Gene and Walter on September 20, 2010.  The Request and Order to Seize Property dated September 20, 2010 that was entered against Eugene Thomas (a/k/a Eugene Jamil) is attached hereto as Exhibit M.  The Request and Order to Seize Property dated September 20, 2010 that was entered against Walter Thomas (a/k/a Walter Jamil) is attached hereto as Exhibit N.  The September 20, 2010 Orders are collectively referred to as "Order to Seize Property").

121.    The Order to Seize Property arose under the Judgment for $2,800,000.00 in favor of Computer Business World, LLC, and the Judgment is dated November 12, 2008, against Walter and Gene.

122.    The Order to Seize Property arose exclusively under the Judgment  against Walter and Gene and did not include either Nibras or Joanna as a Judgment Debtor.  The Order did not specify the property to be seized, only that property belonging to either Walter or Gene be seized.

123.    Nibras, Walter's wife, is not a Judgment Debtor, and the Order to Seize Property issued by the Court did not give the Judgment Creditor or the Court Officer, the authority to seize assets belonging to Nibras, or assets belonging to other family members, such as Juliet Jamil, or Clarys Jamil, or items belonging to Walter and Nibras' children.

124.    Likewise, Joanna, Gene's wife, is not a Judgment Debtor, and the Order to Seize Property issued by the Court did not give the Judgment Creditor or the Court Officer, the authority to seize assets belonging to Joanna, nor does it give the Judgment Creditor or the Court Officer the authority to seize assets belonging to Juliet Jamil, or Clarys Jamil, nor Joanna and Gene's children.

125.    Neither Nibras nor Joanna were parties to the underlying litigation which gave rise to the Judgment under which the Order to Seize Property was issued, nor are they Judgment Debtors under that Judgment.

126.    On or about September 27, 2010, Timothy Lennon, a Court Officer, went to Walter and Nibras' home with an Order to Seize Property that Oakland County Circuit Court Judge Wendy Potts signed on September 20, 2010.

127.     On or about September 28, 2010, the day after the seizure of property at the Jamil home, the same man conducted a seizure of property at Gene and Joanna's home pursuant to the September 20, 2010 Order to Seize Property.

128.     The house where he went to seize Walter's assets on September 27, 2010 pursuant to the Order to Seize Property is owned by Walter and Nibras, as husband and wife. They reside in that house with their children.

129.     At the time that he came to the Jamil household to seize assets, both Walter and Nibras objected to the entry onto the premises and the seizure of personal property from the house.

130.     Nibras did not give permission to him to enter the premises, nor did she give permission to the movers who came to the property to remove the personal property from the house. He entered the home over Walter and Nibras' objection. The movers entered the premises at his direction.

131.     Over Nibras and Walter's objections, personal property which did not belong to Walter and belonged to others, including furniture, furnishings, toys, were removed from their home.

132.     Joanna, Gene's wife, is not a Judgment Debtor. She was not a party to the underlying litigation which gave rise to the Judgment upon which the Order to Seize Property was issued, nor is Ms. Thomas a Judgment Debtor under that Judgment. Further, the Order to Seize Property issued by the Court did not give the Judgment Creditor or the Court Officer the authority to seize assets belonging to Joanna.

133.     When the same man came to the Thomas house to remove property under the Order to Seize Assets, both Joanna and Gene objected to the entry into the premises. Joanna did not give

23

permission to him to enter the premises, but he stated that he had a Court Order, that he was coming in to take property under the Order, and that he would get a locksmith to break the doors.

134.    Over Joanna and Gene's objections, personal property which did not belong to Gene, and belonged to others, including furniture, furnishings, and toys, were removed from their home. This vexatious and harassing tactic against Gene and Walter and their families has caused tremendous duress.

**The Legal Malpractice Claim.**

135.    Because Gene and Walter's attorneys failed to represent their legal best interests and protect their rights regarding the handling of the sale of their businesses and the subsequent legal matters, Gene and Walter filed a claim of legal malpractice against them.

136.    During discovery in the legal malpractice case, Defendants Daneshgari, Shabander and Breslin gave deposition testimony. The testimony established that Defendants Daneshgari, Shabander and Breslin knowingly and intentionally gave false and misleading evidence and testimony in the Arbitration which led to the adverse outcome and the catastrophic consequences that flowed from that adverse result.

**The Perjured Testimony in the Arbitration.**

137.    Defendants Daneshgari, Shabander, and Breslin all conspired to bleed the business and drain the assets of CBW, LLC as described in the proceeding paragraphs, and create a non-dischargeable debt for Gene and Walter.

138.     Defendants Daneshgari, Shabander and Breslin further conspired with one another to allege fraud by Gene and Walter in an Arbitration action against Gene and Walter whereby Daneshgari, Shabander, and Breslin knowingly and intentionally gave false and misleading evidence and  testimony and committed a fraud upon the Arbitrator, and further victimized Gene and Walter in the process.

139.     The primary motivation for creating the issue of fraud was that, with an adverse ruling by the Arbitrator on the basis of fraud, the Arbitration decision would form the basis of a judgment that could not be discharged in any Federal Bankruptcy proceeding.

140.     Defendant Daneshgari testified at arbitration that he and CBW were "blacklisted by Intel and AMD". This testimony was a significant part of why an award was rendered at arbitration against  Gene and Walter. Defendant Daneshgari' s testimony that he and CBW were "blacklisted" was a vital piece of testimony in his damages claim and was proven to be false, and misleading.

141.     However, Defendant Daneshgari's testimony at arbitration that he was "blacklisted" was perjurious.  He was asked that very question in the legal malpractice deposition, and he said he "didn't know" and "wasn't sure".

142.     However, now a document has since surfaced that proves he knowingly and intentionally gave false and misleading evidence and  testimony.  Intel and AMD were both still doing business with Defendant Daneshgari and CBW, and he perjured himself during arbitration testimony.

143.     Defendant Daneshgari had this document, and it was withheld at the Arbitration. Had Defendant Daneshgari produced it,  it would have disproved Defendant Daneshgari's damages claim

in part. It also would have shown that there was no fraud committed by Gene and Walter and that Intel and AMD were aware and on board with the MDF program.

144.    Defendant Daneshgari's knowingly and intentionally gave false and misleading evidence and testimony at Arbitration that Intel and AMD blacklisted him that led in part to the arbitration award against them.

145.    Defendants Daneshgari, Shabander, and Breslin all knew before, and at the time of, the arbitration that CBW and Defendant Daneshgari had not been "blacklisted", and that, in fact, Intel still did business with CBW and Defendant Daneshgari. However, as part of the conspiracy to commit fraud by Defendants Daneshgari, Shabander, and Breslin, they perpetuated perjurious testimony.

146.    Defendant Breslin testified at Arbitration that he had not told Defendant Daneshgari about the MDF program until the end of the year, perhaps December 2006. This was vital testimony as it would tend to show an act of fraud, and had Defendant Daneshgari been aware of this back in July, it would have thwarted the sale of the CBW businesses, and Defendant Daneshgari would not have been victimized by fraud as he'd alleged. However, Defendant Breslin's testimony was false and misleading.

147.    In his deposition in the legal malpractice case, Defendant Breslin testified that he did, in fact, tell Defendant Daneshgari about the MDF program in early July 2006. This is vital information, as it proves Defendant Daneshgari knew of the MDF practice from the beginning and in fact collected $200,000.00 from the program!

148.     Had Defendant Breslin testified truthfully at Arbitration, there would be no finding of fact by the Arbitrator that Gene and Walter had committed any fraud. It turns out that the fraud was the conspiracy by Defendants Daneshgari, Shabander, and Breslin, and this knowingly and intentionally false and misleading evidence and  testimony by Defendant Breslin is emblematic of this.

149.     Defendant Breslin also testified at arbitration that CBW, LLC did not run any ads that qualified under the MDF program. Defendant Breslin's testimony was perjurious.

150.     In the legal malpractice deposition, Defendant Breslin testified CBW did, in fact, run some ads that qualified. Again, had Defendant Breslin testified truthfully at arbitration, a finding of fact by the Arbitrator, and a subsequent award against Gene and Walter would never have been made.

151.     The conspiracy to commit fraud through perjurious testimony by Defendants Daneshgari, Shabander, and Breslin led Defendant Breslin to provide knowingly and intentionally false and misleading evidence and testimony in the Arbitration.

152.     Defendant Shabander testified in the Arbitration that Gene and Walter were dishonest in their dealings with Defendant Daneshgari, and their intentional deceit defrauded Defendant Danishgari and CBW, leading to an Arbitrator's award against Gene and Walter. Defendant Shabander's testimony was perjurous.

153.     A year later, in his deposition in the TBI matter (a matter that was ultimately before Federal Judge Arthur Tarnow), Defendant Shabander testified under oath that Gene and Walter were honest people and were always honest in their dealings.

154.    Defendant Shabander provided knowingly and intentionally false and misleading evidence and  testimony at the Arbitration.  Had Defendant Shabander testified truthfully at Arbitration, a finding of fact by the Arbitrator, and subsequent award against Gene and Walter is never made.

155.    The conspiracy to commit fraud through perjurious testimony by Defendants Daneshgari, Shabander, and Breslin led to Defendant Shabander providing knowingly and intentionally false and misleading evidence and testimony and deliberate misleading of the Arbitrator.

156.    Defendant Shabander also testified at the arbitration that SAM systems had stopped purchasing from CBW/Daneshgari, which was based on SAM Systems' income from 2005 and 2006, and this had an adverse impact on Defendant Daneshgari's profitability which ultimately resulted in CBW going out of business. Defendant Shabander's testimony was perjurious.

157.    In the legal malpractice deposition, Defendant Shabander testified that SAM Systems had no money, which was knowingly and intentionally false and misleading evidence and testimony.

158.    Defendant Shabander also testified at the arbitration that he did not talk with Defendant Daneshgari until May 2006, which interfered with Defendant Daneshgari's ability to conduct due diligence as it limited his contact with CBW's CFO and his access to CBW's financial records.

159.    However, in the legal malpractice deposition, Defendant Shabander testified that he met with, and was interviewed by, Defendant Daneshgari on March 7, 2006 as part of a site visit conducted by Defendant Daneshgari's company, MCA.

28

160.     In an interesting development, the Michigan Court of Appeals held Defendant Daneshgari in contempt in July 2011, in another case, and indicated that Defendant Daneshgari's company MCA was "shuttered".

161.     Defendant Daneshgari testified in the legal malpractice case that he was President of MCA, a going concern. Defendant Daneshgari also paid MCA tens of thousands of dollars from CBW, LLC for MCA to act as "consultants" to the business, which was a sham.

162.     Defendants Daneshgari, Shabander, and Breslin all conspired to bleed the business and drain CBW, LLC before bringing an action against Gene and Walter whereby Daneshgari, Shabander, and Breslin would all conspire to perjure themselves and commit fraud upon the Arbitrator, and victimize Gene and Walter in the process.

163.     Recently, a misrepresentation was made by an attorney for Defendant Daneshgari that TBI had a judgment against it, which is part of the pattern of abuse of process and false and misleading representations by Defendant Daneshgari and people acting on his behalf.

164.     Defendant Shabander downplayed his wife's employment career at CBW in order to distance her, and himself, from the MDF invoices. He falsely testified during the Arbitration that she was employed at the CBW businesses for only one year, when, in fact, she had worked there for almost three years.

165.     Defendant Shabander claimed she only had a minor marketing position, when he testified at the Arbitration. In fact, she was the Marketing Director, and was responsible for the MDF program, which was the major focus of the Arbitrator's decision of fraud by Gene and Walter.

166.     This false and misleading testimony was part of the conspiracy by Defendants Daneshgari, Shabander, and Breslin.

## COUNT I

## VIOLATIONS OF THE RACKETEER INFLUENCED AND

## CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961 *et seq.*

## (AS TO DEFENDANTS DANESHGARI, SHABANDER AND BRESLIN)

167.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 166 word for word, and paragraph by paragraph, as if recited herein at length and incorporate same herein by reference.

168.    Gene and Walter are persons under 18 U.S.C. §§1961(3) and 1964(c).

169.    Defendants Daneshgari, Shabander and Breslin, each are a person under  18 U.S.C. §§1961(3), 1962(b) and 1964(d).

170.    Pursuant to 18 U.S.C. §1961(1), "racketeering activity" is defined as any act "chargeable" under several state criminal laws, any act "indictable" under numerous specific federal criminal provisions, and any "offense" involving bankruptcy, securities fraud, or drug related activities that are punishable under federal law.

171.    18 U.S.C. §1962(c) prohibits conducting or participating in an enterprise through a pattern of racketeering activity, while 18 U.S.C. §1962(d) prohibits conspiring to violate 18 U.S.C. §1962(c).

173.    From June 2006, the exact date(s) and time(s) unknown to Gene and Walter at this time, and continuing on to the present date in time, Defendants conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. §1962(b), that is Defendants conspired among themselves to commit various criminal acts through a pattern of activity that is unlawful under 18 U.S.C. §1961(1)(A), in conducting the affairs of the enterprise.

174.     Defendants Daneshgari, Shabander and Breslin further conspired with one another to allege fraud by Gene and Walter in an Arbitration action against Gene and Walter whereby Daneshgari, Shabander, and Breslin all perjured themselves and committed a fraud upon the Arbitrator, and further victimized Gene and Walter in the process.

175.     As described in the proceeding paragraphs, the Arbitrator found in favor of Defendants Daneshgari and CBW, LLC, based upon the perjured testimony of Defendants Daneshgari, Shabander and Breslin.

176.     Defendants Daneshgari, Shabander and Breslin conspired among themselves to provide perjured testimony to achieve an improper Arbitration award and further that the conspiracy among Defendants Daneshgari, Shabander, and Breslin was to drain the assets of CBW, LLC, to defraud Gene and Walter, and to create a non-dischargeable debt for Gene and Walter.

177.     That perjured testimony by Defendants Daneshgari, Shabander and Breslin caused the Arbitrator to believe that Gene and Walter had engaged in fraudulent activity.

178.     The primary basis for creating the issue of fraud was that, with an adverse ruling by the Arbitrator on the basis of fraud, the Arbitration decision would later form the basis of a judgment that could not be discharged in any bankruptcy proceeding.

179.     Defendants Daneshgari, Shabander, and Breslin all conspired to bleed the business and drain the assets of CBW, LLC as described in the proceeding paragraphs, and to create a non-dischargeable debt.

180.     Defendants Daneshgari, Shabander and Breslin also conspired to prevent Walter from being gainfully employed by CBW, LLC after the sale of the CBW businesses to Defendant

31

Daneshgari in order that Walter would be financially harmed and uninformed about the draining of the assets of CBW, LLC.

181.    Defendants Daneshgari, Shabander and Breslin also conspired to prevent Gene from providing contractor services to CBW, LLC after the sale of the CBW businesses to Defendant Daneshgari in order that Gene would be harmed and uninformed about the draining of the assets of CBW, LLC.

182.    Further, Defendants Daneshgari, Shabander and Breslin conspired to create false billings to CBW, LLC in order to divert monies to Defendant Daneshgari personally, both directly and indirectly.

**WHEREFORE,** Plaintiffs respectfully pray for a judgment in an amount in excess of $75,000.00 against Defendants, and for other relief, included but not limited to treble damages, injunctive relief, reasonable attorney fees and costs, interest, and such other relief as the Court deems just and proper.

## COUNT II

### BREACH OF AMENDED AND RESTATED
### PHANTOM MEMBERSHIP INTEREST AGREEMENTS

### (AS TO DEFENDANTS DANESHGARI AND CBW, LLC)

183.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 182 word for word, and paragraph by paragraph, as if recited herein at length and incorporate same herein by reference.

184. Defendants Daneshgari, Shabander and Breslin conspired among themselves to provide perjured testimony to achieve an improper Arbitration award and further that the conspiracy among Defendants Daneshgari, Shabander, and Breslin was to drain the assets of CBW, LLC, to defraud Gene and Walter, and to create a non-dischargeable debt.

185. Defendants Daneshgari, Shabander and Breslin also conspired to prevent Walter from being gainfully employed by CBW, LLC after the sale of the CBW businesses to Defendant Daneshgari in order that Walter would be harmed.

186. Defendants Daneshgari, Shabander and Breslin also conspired to prevent Gene from providing contractor services to CBW, LLC after the sale of the CBW businesses to Defendant Daneshgari in order that Gene would be harmed.

187. Further, Defendants Daneshgari, Shabander and Breslin conspired to create false billings to CBW, LLC in order to divert monies to Defendant Daneshgari personally, both directly and indirectly.

188. A valid contract existed between CBW, LLC and Gene.

189. A valid contract existed between CBW, LLC and Walter.

190. Defendant Daneshgari is the majority member of CBW, LLC.

191. Defendants Daneshgari and CBW, LLC materially breached the Membership Agreements by:

> a. Failing to provide copies of the balance sheets, related statement of income and retained earnings, and independent audit report, after the end of each fiscal year;
>
> b. Failing to perform their contractual duties and obligations under the Membership Agreements;

c. Failing to exercise due care and diligence the management of CBW, LLC;

d. Failing to manage CBW, LLC in a reasonably prudent and fair manner;

e. Failing to perform the obligations under the Membership Agreements;

f. Failing to properly make all decisions and take all actions on behalf of CBW, LLC in connection with the day to day operations of CBW, LLC;

g. Draining assets of the CBW, LLC in order to deny Gene and Walter their rightful share of profits of CBW, LLC;

h. Denying Gene and Walter their rightful share of profits of CBW, LLC;

i. Diverting CBW, LLC's inventory and pocketing the funds to deny Gene and Walter their rightful share of profits of CBW, LLC;

j. Diverting CBW, LLC's business opportunities in order to deny Gene and Walter their rightful share of profits of CBW, LLC;

k. Refusing to continue Gene's contractor relationship with CBW, LLC; and

l. Refusing to continue Walter's employment relationship with CBW, LLC.

192. The material breaches of the Membership Agreements have caused significant damage to Gene and Walter.

193. The material breaches of the Membership Agreements have caused significant damage to Gene and Walter's reputation and good will.

**WHEREFORE,** Plaintiffs respectfully request this Court enter a judgment in their favor against Defendants for damages in an amount in excess of $75,000.00 that is sufficient to

34

compensate Plaintiffs for their actual, consequential, and incidental damages, sustained as a result of Defendants' wrongful actions, plus interest, costs and actual attorney fees.

## COUNT III

### OPPRESSION OF PHANTOM MEMBER INTEREST IN LLC

### (AS TO DEFENDANTS DANESHGARI, SHABANDER AND CBW, LLC)

194.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 193 word for word, and paragraph by paragraph, as if recited herein at length and incorporate same herein by reference.

195.    Gene and Walter own phantom minority membership interests of 5% each in CBW, LLC, and Defendant Daneshgari is the majority member and in control of CBW, LLC.

196.    At all relevant times, Defendant Shabander was the Chief Financial Officer of CBW, LLC.

197.    Gene and Walter retained their phantom minority membership interests in CBW, LLC at all times relevant to the Complaint, and will continue to be members through the time of judgment.

198.    Defendant Daneshgari exerted wrongful control and dominion over CBW, LLC, and his conduct, as set forth herein, has at times been illegal, fraudulent, willfully unfair, and oppressive to Gene and Walter.

199.    At all relevant times, Defendant Shabander, as the Chief Financial Officer of CBW, LLC, conspired with Defendant Daneshgari to exert wrongful control and dominion over CBW, LLC, and his conduct, as set forth herein, has at times been illegal, fraudulent, willfully unfair, and oppressive to Gene and Walter.

35

200.     Defendants Daneshgari and Shabander have engaged in a continuing course of conduct, or a significant action or series of actions, that substantially interfered with Gene and Walter's membership interest in CBW, LLC, including, among other things, their conduct as described in the proceeding paragraphs.

201.     Specifically, Defendants CBW, LLC, Daneshgari, and Shabander have engaged in the following illegal, fraudulent, willfully unfair and oppressive actions, among others, by:

a.      Breaching Walter's employment agreement;

b.      Breaching Gene's contractor agreement;

c.      Draining the assets and looted CBW, LLC at Gene and Walter's expense;

d.      Siphoned off funds for himself personally;

e.      Usurping business opportunities;

f.      Hiding the details of various business endeavors from Gene and Walter;

g.      Engaging in corporate fraud;

h.      Engaging in self-dealing;

i.      Lying to Gene and Walter about numerous matters of official business;

j.      Breaching their fiduciary duties in a myriad of fashions;

k.      Using corporate monies for personal expenses and matters;

l.      Withholding important corporate information from Gene and Walter;

m.      Wilfully damaging CBW, LLC and Gene and Walter;

n.      Committing accounting fraud and misstated earnings;

o.      Committing various other frauds in order to line their own pockets;

p.  Wrongfully refusing to distribute to Gene and Walter their
fair share of profits;

q.  Limiting and then terminating Gene and Walter's opportunity or
ability to participate in, be informed about, manage, or oversee
business operations;

r.  Forcing Gene and Walter out of the business;

s.  Denying Gene and Walter the financial benefit of their
ownership interest; and

t.  Engaging in a continuing course of conduct designed to
oppress, defraud, abuse, and damage Gene and Walter, their
membership interests, and their employment and/contractor
relationship at CBW, LLC.

202.   The actions of Defendants CBW, LLC, Daneshgari, and Shabander are willfully
unfair, oppressive, fraudulent, illegal and in further derogation of Gene and Walter's rights and
membership interests.

203.   The actions of Defendants CBW, LLC, Daneshgari, and Shabander are wanton,
willful, and malicious, and Gene and Walter are entitled to exemplary damages.

**WHEREFORE,** Plaintiffs respectfully pray for a judgment in an amount in excess of
$75,000.00 against Defendants, including all compensatory damages, lost profits, treble damages for
conversion, exemplary damages, non-economic damages, and all other damages of any kind and
nature to which Plaintiffs are entitled, and for other relief, included but not limited to an order
requiring Defendants to purchase Plaintiffs' interests in CBW, LLC at a fair and reasonable price to
be determined as if there were no willfully unfair, oppressive, fraudulent, or illegal actions, a full
accounting, as well as an order requiring Defendants to turn over all of the records that Plaintiffs are

entitled to, together with all of the books and records in any way relating to CBW, LLC, an award of reasonable attorney fees and costs, interest, and such other legal and equitable relief as the Court deems just and proper.

## COUNT IV

## STATUTORY AND COMMON LAW CONVERSION

## (AS TO DEFENDANT DANESHGARI ONLY)

204.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 203 word for word, and paragraph by paragraph, as if recited herein at length and incorporate same herein by reference.

205.    Defendant Daneshgari has, on multiple occasions, converted the property of CBW, LLC, and owed to Gene and Walter for his own personal use, or his family.

206.    Defendant Daneshgari's acts of conversion, include, among other things:

    a.    Selling large quantities of CBW, LLC's inventory for cash, for which he did not account for and for which he took for his own personal use;

    b.    Draining the assets of the CBW businesses;

    c.    Denying Gene and Walter their rightful share of profits of CBW, LLC pursuant to the Membership Agreement;

    d.    Diverting over $500,000.00 in inventory from CBW, LLC and diverting the inventory to a computer store he opened in Grand Blanc, Michigan;

    e.    Paying his own company, MCA, an exorbitant fee of $70,000.00 per month.

    f.    Billing CBW, LLC approximately $800,000.00 for unnecessary consulting services; and

g.      Selling almost $400,000.00 in computer hardware and related inventory to a big box store, below cost, and pocketing the money; and

h.      Leasing CBW corporate headquarters to one of his (sham) office buildings and charging over $200,000.00 in rent in less than one year.

207.    Defendant Daneshgari's actions were taken without Gene and Walter's knowledge or consent, and such actions constituted a willful exercise of dominion over property in which Defendant Daneshgari had no rights of ownership, and which were inconsistent with the rights of the true owners.

208.    As a direct and proximate result of Defendant Daneshgari's actions, Gene and Walter sustained damages.

209.    Defendant Daneshgari's actions constitute unlawful and wrongful dominion and control over funds belonging to CBW, LLC, and/or Gene and Walter, and are a conversion under MCL 600.2919(a).

210.    MCL 600.2919(a) allows a plaintiff to recover three times the amount of actual damages sustained as a result of a defendant's conversion, plus attorney fees.

211.    As a proximate result of Defendant Daneshgari's actions, Gene and Walter are entitled to treble damages, plus interest, attorney fees and exemplary damages.

**WHEREFORE,** Plaintiffs respectfully pray for a judgment in an amount in excess of $75,000.00 against Defendant, including all compensatory damages, lost profits, treble damages for conversion, exemplary damages, non-economic damages, and all other damages of any kind and nature to which Plaintiffs are entitled and for other relief, including injunctive relief, reasonable

attorney fees and costs, a full accounting, as well as an order requiring Defendant to turn over all of the books and records in any way relating to CBW, LLC, and such other legal and equitable relief as the Court deems just and proper.

## COUNT V

## AIDING AND ABETTING CONVERSION

## (AS TO DEFENDANTS SHABANDER AND BRESLIN)

212.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 211 word for word, and paragraph by paragraph, as if recited herein at length and incorporate same herein by reference.

213.     Defendants Shabander and Breslin participated in Defendant Daneshgari's commission of statutory and common law conversion and aided and abetted such conversion.

214.     Defendants Daneshgari, Shabander and Breslin knowingly joined one another in an enterprise such that they violated the law and that their personal interests were antagonistic to CBW, LLC and Gene and Walter.

215.     Gene and Walter incurred substantial damages as a result of the actions of Defendants Daneshgari, Shabander and Breslin in this regard.

216.     The conduct of Defendants Daneshgari, Shabander and Breslin has at all times been willful, wanton and malicious, and therefore, Gene and Walter are entitled to exemplary damages.

**WHEREFORE,** Plaintiffs respectfully pray for a money judgment in an amount in excess of $75,000.00 against Defendants, including all compensatory damages, lost profits, treble damages for conversion, exemplary damages, non-economic damages, and all other damages of any kind and nature to which Plaintiffs are entitled, and for other relief, included but not limited to, injunctive relief, reasonable attorney fees and costs, and such other legal and equitable relief as the Court deems just and proper.

## COUNT VI

## ACCOUNTING

## (AS TO DEFENDANTS DANESHGARI AND CBW, LLC)

217.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 216 word for word, and paragraph by paragraph, as if recited herein at length and incorporate same herein by reference.

218.    Defendant Daneshgari has possession of all of the books and records of CBW, LLC.

219.    Pursuant to the respective Membership Agreements, within 135 days of the end of each fiscal year, Gene and Walter are each entitled to copies of the balance sheets of CBW, LLC, together with any related statements of income and retained earnings, together with the audit report of an independent certified public accountant as selected by CBW, LLC.

220.    Despite the requirements outlined in their respective Membership Agreements, Gene and Walter have never been provided CBW, LLC's financial records.

221.    Pursuant to their respective Membership Agreements, Gene and Walter seek all the financial statements and supplemental schedules to which they are entitled to, including, and without limitations, year-end balance sheets, income statements, statements of the source and application of funds, statement of cash flows, and records of daily cash receipts.

222.    Further, Gene and Walter are entitled to an accounting of all transactions engaged by Defendant Daneshgari in any way relating to CBW, LLC's business and business assets.

223.    Gene and Walter seek to fully inspect all of the books and records of CBW, LLC and seek a formal accounting of CBW, LLC's affairs as provided in MCL 450.4503(4).

224.    Further, and pursuant to MCL 450.4503(1), Gene and Walter also seek all financial statements and supplemental schedules, including, and without limitations, year-end balance sheets, income statements, statements of the source and application of funds, statement of cash flows, and records of daily cash receipts.

225.    Pursuant to MCL 450.4503(2) and 450.4213, Gene and Walter also seek the full names and last known addresses of the current members and managers; copies of the articles of organization, including any restatements or amendments; copies of the federal and state tax returns for the last three years; copies of the financial statements for the last three years; copies of all operating agreements and amendments; and statements of the source and application of funds, statement of cash flows, and such records so as to determine each members' relative shares in CBW, LLC's distribution and relative voting rights.

**WHEREFORE,** Plaintiffs respectfully pray for a full accounting, as well as an order requiring Defendants to turn over all of the records that Plaintiffs are entitled to, together with all

of the books and records in any way relating to CBW, LLC, an award of reasonable attorney fees and costs, interest, and such other legal and equitable relief as the Court deems just and proper.

## COUNT VII

## BREACH OF FIDUCIARY DUTIES

## (AS TO DEFENDANTS DANESHGARI AND CBW, LLC)

226.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 225 word for word, and paragraph by paragraph, as if recited herein at length and incorporate same herein by reference.

227.    As the controlling member of CBW, LLC, Defendant Daneshgari owed fiduciary duties to Gene and Walter to act with the highest level of good faith, care, loyalty, and fidelity in all dealings for and on behalf of CBW, LLC.

228.    Defendant Daneshgari breached his fiduciary duties to Gene and Walter, by, among other things, placing his own self-interest before those of CBW, LLC at all times, engaging in conduct intended to defraud and oppress Gene and Walter, and using his control over CBW, LLC to obtain financial and other benefits to which he was not entitled, all as described in the proceeding paragraphs.

229.    Defendant Daneshgari has engaged in conduct oppressive to Gene and Walter as set forth in detail herein, including, but not limited to: acting to deny Gene and Walter the financial benefit of their membership interests in CBW, LLC; committing various frauds in order to line his own pockets, deceiving and defrauding Gene and Walter, concealing information from Gene and Walter, and wrongfully refusing to distribute to Gene and Walter their fair share of profits.

43

230.     As a result of Defendant Daneshgari's numerous and substantial breaches of fiduciary duty, Gene and Walter have suffered significant damages.

**WHEREFORE,** Plaintiffs respectfully pray for a judgment in an amount in excess of $75,000.00 against Defendants, including all compensatory damages, lost profits, treble damages for conversion, exemplary damages, non-economic damages, and all other damages of any kind and nature to which Plaintiffs are entitled, and for other relief, included but not limited to an order requiring Defendants to purchase Plaintiffs' interests in CBW, LLC at a fair and reasonable price to be determined as if there were no willfully unfair, oppressive, fraudulent, or illegal actions, a full accounting, as well as an order requiring Defendants to turn over all of the records that Plaintiffs are entitled to, together with all of the books and records in any way relating to CBW, LLC, an award of reasonable attorney fees and costs, interest, and such other legal and equitable relief as the Court deems just and proper.

## COUNT VIII

## ABUSE OF PROCESS

## (AS TO DEFENDANTS DANESHGARI, SHABANDER AND BRESLIN)

231.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 230 word for word, and paragraph by paragraph, as if recited herein at length and incorporate same herein by reference.

232.     Defendant Daneshgari purchased the CBW businesses with the intent and purpose to sell off the inventory, bleed the assets, run the various companies into the ground, and then pursue Gene and Water for repayment of the proceeds from the sale of the CBW businesses.

233.     Defendants Daneshgari, Shabander, and Breslin all conspired to bleed the business and drain the assets of CBW, LLC as described in the preceding paragraphs, and to create a non-dischargeable debt for Gene and Walter.

234.     Defendants Daneshgari, Shabander and Breslin further conspired with one another to allege fraud by Gene and Walter in an Arbitration action against Gene and Walter whereby Daneshgari, Shabander, and Breslin all perjured themselves by knowingly and intentionally providing false and misleading evidence and testimony in the Arbitration proceedings, committed a fraud upon the Arbitrator, and victimized Gene and Walter in the process.

235.     In 2007, Defendant Daneshgari caused an Arbitration proceeding to commence against Gene and Walter for breach of contract and fraud in the inducement.  The Defendants conspired together to perjured themselves by providing knowingly and intentionally false and misleading evidence and testimony in the Arbitration proceedings.

236.     Defendants Daneshgari, Shabander and Breslin conspired among themselves to provide perjured testimony to achieve an improper Arbitration award, and, further, that the conspiracy among Defendants Daneshgari, Shabander, and Breslin was to drain the assets of CBW, LLC, to defraud Gene and Walter, and to create a non-dischargeable debt.

237.     That perjured testimony by Defendants Daneshgari, Shabander and Breslin caused the Arbitrator to believe that Gene and Walter had engaged in fraudulent activity.

45

238.    As described in the preceding paragraphs, the Arbitrator found in favor of Defendants Daneshgari and CBW, LLC, based upon the perjured testimony of Defendants Daneshgari, Shabander and Breslin.

239.    The primary basis for creating the issue of fraud was that, with an adverse ruling by the Arbitrator on the basis of fraud, the Arbitration decision would later form the basis of a judgment that could not be discharged in any bankruptcy proceeding.

240.    In November, 2008, Defendant Daneshgari initiated a civil lawsuit to confirm the arbitration award.

241.    In November, 2008, Defendant Daneshgari initiated a second lawsuit to compel the Oakland County Circuit Court to force Joanna and Nibras to give up their membership interest in TBI and to transfer said interest to Defendant.

242.    In October, 2009, Defendant Daneshgari caused Adversary Proceedings to be filed against Joanna and Nibras in each of their husbands' bankruptcy proceedings for the purpose of trying to void the transfer of TBI to Joanna and Nibras that had occurred seven years earlier.

243.    The allegations and misuse of the civil process were improper since the Defendants knew, or should have known, that the allegations raised in the Arbitration and the subsequent lawsuits against Gene and Walter were false and were made to further the conspiracy between Defendants to commit the various wrongful and illegal acts as described in the proceeding paragraphs.

244.    As a direct and proximate result of Defendant Daneshgari's actions, Gene and Walter sustained damages.

46

245.     As a direct result of Defendants' abuse of the civil process, Gene and Walter's business reputation and status within the business community and the general public has been damaged.

246.     Further, the allegations and misuse of the civil process relating to the ownership of TBI were improper since the Defendants knew that the allegations that Gene and Walter were owners of TBI were false.

247.     Defendant Daneshgari was fully aware that Gene and Walter's membership interest in TBI was transferred to Joanna and Nibras in October 2003, and that Gene and Walter were no longer TBI's owners.

248.     As a direct and proximate result of Defendant Daneshgari's actions, Gene and Walter sustained damages.

249.     As a direct result of Defendants' abuse of the civil process, Gene and Walter's business reputation and status within the business community and the general public has been damaged.

**WHEREFORE,** Plaintiffs respectfully pray for a judgment in an amount in excess of $75,000.00 against Defendants, including all compensatory damages, lost profits, treble damages for conversion, exemplary damages, non-economic damages, and all other damages of any kind and nature to which Plaintiffs are entitled, and for other relief, included but not limited to an award of reasonable attorney fees and costs, interest, and such other legal and equitable relief as the Court deems just and proper.

## COUNT IX

## VIOLATIONS OF FAIR DEBT COLLECTION PRACTICES ACT

## 15 U.S.C. §1692 *et seq.*

## (AS TO DEFENDANT DANESHGARI AND CBW, LLC)

250.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 249 word for word, and paragraph by paragraph, as if recited herein at length and incorporate same herein by reference.

251.    The judgment obtained  by Defendant Daneshgari is a debt that arises out of a transaction within the meaning of 15 U.S.C. § 1692a(5).

252.    At all times relevant to the allegations in the Complaint, Defendant Daneshgari has acted as a debt collector within the meaning of 15 U.S.C. § 1692a(6).

253.    At all times as further stated in the Complaint, Defendant Daneshgari has used abusive, deceptive, and unfair debt collection practices in the collection of a debt in violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1601 *et seq.*

254.    Defendants Daneshgari, Shabander, and Breslin all conspired to bleed the business and drain the assets of CBW, LLC as described in the preceding paragraphs, and create a non-dischargeable debt for Gene and Walter.

255.    Defendants Daneshgari, Shabander and Breslin further conspired with one another to allege fraud by Gene and Walter in an Arbitration action against Gene and Walter whereby Daneshgari, Shabander, and Breslin all perjured themselves and committed a fraud upon the Arbitrator, and victimized Gene and Walter in the process.

256.    Defendants Daneshgari, Shabander and Breslin conspired among themselves to provide perjured testimony to achieve an improper Arbitration award, and, further, that the conspiracy among Defendants Daneshgari, Shabander, and Breslin was to drain the assets of CBW, LLC, to defraud Gene and Walter, and to create a non-dischargeable debt by Gene and Walter.

257.    The primary basis for creating the issue of fraud was that, with an adverse ruling by the Arbitrator on the basis of fraud, the Arbitration decision would form the basis of a judgment that could not be discharged in any bankruptcy proceeding.

258.    Defendant Daneshgari has engaged in violations of the Fair Debt Collections Practices Act by engaging in conduct the natural consequences of which are to harass, oppress, or abuse any person in the collection of a debt, in violation of the general prohibitions in 15 U.S.C. § 1692d.

259.    Defendant Daneshgari has further engaged in violations of the Fair Debt Collections Practices Act by using generally, false misleading or unfair methods to collect the debt, in violation of the general prohibitions in 15 U.S.C. § 1692e.

260.    Defendant Daneshgari has further engaged in violations of the Fair Debt Collections Practices Act by making a false representation of the character, amount, or legal status of the debt, in violation of 15 U.S.C. § 1692e(2).

261.    Defendant Daneshgari has further engaged in violations of the Fair Debt Collections Practices Act by communicating or threatening to communicate credit information which is known or which should be known to be false, in violation of 15 U.S.C. § 1692e(8).

262.    Defendant Daneshgari has further engaged in violations of the Fair Debt Collections Practices Act by continuing to use false representations or deceptive means to collect or attempt to collect any debt, in violation of 15 U.S.C. § 1692e(10).

263.    Defendant Daneshgari has further engaged in violations of the Fair Debt Collections Practices Act by using unfair and unconscionable means to collect the debt by taking nonjudicial action to effect dispossession of property that was exempt by law from such dispossession, in violation of 15 U.S.C. § 1692f(6).

**WHEREFORE,** Plaintiffs respectfully pray for a judgment in an amount in excess of $75,000.00 against Defendants, including all compensatory damages, statutory damages, treble damages statutory costs and attorney fees, injunctive relief to enjoin Defendants from any further collection of the debt, interest, and such other legal and equitable relief as the Court deems just and proper.

Respectfully submitted,

s/ Ronald G. Acho
Ronald G. Acho
CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C.
Attorneys for Plaintiff
33900 Schoolcraft Road
Livonia, MI 48150
(734) 261-2400
racho@cmda-law.com
P-23913

Dated: January 30, 2013

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EUGENE J. THOMAS, an individual, and
WALTER JAMIL, (a/k/a WISAM
JAMIL and WALTER THOMAS),

              Plaintiffs,                  Case No. 2013-cv-_____

v.

PARVIZ DANESHGARI, (A/K/A PERRY
DANESHGARI), an individual, HAROLD G.
BRESLIN, (a/k/a/ J.R. BRESLIN), an individual,
SAMIR SHABANDER (a/k/a SAM SHABANDER),
an individual, and Computer Business World, LLC,
a Michigan Limited Liability Company,

              Defendants.
_____/

CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C.
By:    **RONALD G. ACHO** (P-23913)
       **JAMES R. ACHO** (P-62175)
33900 Schoolcraft
Livonia, MI 48150-1392
(734) 261-2400
Attorneys for **Plaintiffs**
_____/

## PLAINTIFFS' DEMAND FOR TRIAL BY JURY

NOW COME Plaintiffs, EUGENE THOMAS and WALTER JAMIL by and through their

attorneys, **CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C.** by **RONALD G. ACHO AND**

**JAMES R. ACHO,** and hereby demand a trial by jury in the above-entitled cause.

Respectfully submitted,

/s/ Ronald G. Acho
Ronald G. Acho (P-23913)
CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C.
33900 Schoolcraft Road
Livonia, MI 48150
(734) 261-2400
racho@cmda-law.com
Attorneys for **Plaintiffs**

Date:   January 30, 2013